**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

ALAN PEREIRA,

*Plaintiff*,

v.

MEHLING ORTHOPEDICS LLC, BLUE HORIZON INTERNATIONAL LLC, MEHLING OFFICE MANAGEMENT LLC, BRIAN MEHLING, M.D., individually, and DOREEN SANTORA, individually,

*Defendant*.

25-cv-17745(MEF)(LDW)

**OPINION and ORDER**

**Table of Contents**


I. Background
- A. The Allegations
- B. Procedural History

II. Sex Discrimination
- A. Choice of Law
- B. Merits
  - 1. Quid Pro Quo
  - 2. Conclusion --- and Counterarguments
  - 3. Hostile Workplace
  - 4. A Loose End

II. Disability Claims
- A. Failure to Accommodate
- B. Discrimination

III. Common Law Claims

IV. Conclusion


* * *

The owner of a company and his employee were in a relationship. They broke up, and the owner tried to rekindle things --- but was rebuffed by the employee. From there, there were various workplace changes for the employee. An inability to keep working from home, for example.

The employee came to believe that the owner was discriminating against him, and he filed this lawsuit --- which mainly presses claims under various employment laws.

The defendants, the owner plus some others, have now moved to dismiss.

The motion is denied.

* * *

## I. Background

### A. The Allegations

At this stage of the litigation, the Court must treat the complaint's allegations as true. See McTernan v. City of York, 577 F.3d 521, 526 (3d Cir. 2009). Whether they are in fact true --- that would be an issue for later in the case.

* * *

There are two main players here.

A medical administrator.[1] See Plaintiff's First Amended Complaint ("Complaint") (ECF 19) ¶ 25.

And the owner[2] of an orthopedics practice.[3] See id. ¶ 15.

They had two sets of interactions. One professional, one personal, each running on an overlapping timeline.

* * *

Professional first.

The medical administrator was hired by the orthopedics practice in 2021. See id. ¶ 25. He worked out of the Hackensack, New Jersey office. See id. Not for long, though. About three

---

[1] Alan Pereira.

[2] Brian Mehling.

[3] Mehling Orthopedics LLC.

months into the job, he started working remotely, from his New York City apartment. See id. ¶ 26.

That was how things went until February 2025. Then, the medical administrator was told by the owner of the orthopedics practice that there would be no more remote work --- that he had to go back to working in person, from Hackensack. See id. ¶ 59.

* * *

Now look to a second set of alleged events.

The medical administrator and the orthopedics-practice owner had an intimate personal relationship. See id. ¶ 23.

It got underway in 2013 --- years before the medical administrator started working at the orthopedics practice. See id.

In January 2025, the medical administrator broke things off. See id. ¶ 44. Around 19 days before the medical administrator was told by the owner that he (the administrator) could no longer work remotely. See id. ¶¶ 44, 59, 79.

During those intervening 19-or-so days, the owner repeatedly asked the medical administrator to restart their relationship. See id. ¶¶ 49-50, 54-56. But the administrator said no. See id. And he also said no to requests for sex. See id. ¶¶ 49, 54.

* * *

The administrator came to believe that these two timelines were not separate. Rather, they were intertwined.

To the administrator, the personal sequence was driving the professional one --- the owner took away remote work because the administrator broke up with him and rejected his efforts to get back together. See id. ¶ 60; see also Memorandum of Law in Opposition to Defendants' Motion to Dismiss Plaintiff's First Amended Complaint ("Plaintiff's Brief") (ECF 32) at 22-23.

### B. Procedural History

In light of the above,[4] the medical administrator[5] sued.

From here, he is "the Plaintiff."

The named defendants included the owner of the orthopedics practice.[6] The Plaintiff's supervisor.[7] And the companies that are alleged to have employed the Plaintiffs --- three entities that together made up the orthopedics practice.[8]

Of the named defendants, the main focus here is on the owner. So he is called "the Defendant."

"The Defendants" refers, collectively, to the owner, the supervisor, and the three companies.

The Plaintiff's main claim: a violation by the Defendants of various anti-discrimination laws. See id. ¶¶ 122-25, 132-34, 147-49.[9]

The Defendants have now moved to dismiss the case. See Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint ("Defendants' Brief") (ECF 30-1).

The motion is before the Court.

---

[4] Plus some other workplace issues. See Complaint ¶¶ 47, 50-52, 55-57, 74, 78-79.

[5] Recall: Alan Pereira.

[6] Recall: Brian Mehling.

[7] Doreen Santora.

[8] Mehling Orthopedics LLC. Blue Horizon International LLC. And Mehling Office Management LLC. See Complaint ¶¶ 22, 24, 27. Each of these is allegedly owned by Brian Mehling. See id. ¶ 15.

[9] There are also disability discrimination claims. See id. ¶¶ 122-25, 132-34, 138-43, 147-49. Plus some other claims that relate to the discrimination claims, like claims for aiding and abetting and retaliation. See id. ¶¶ 126-31, 135-37, 144-46, 150-53. And finally, common law claims --- conversion, quantum meruit, and unjust enrichment. See Complaint ¶¶ 154-165. All of the claims here are described as they become relevant.

## II. Sex Discrimination

As noted, the core of the Plaintiff's case is that the anti-discrimination laws were broken here.

But there is a wrinkle.

The Plaintiff contends that the anti-discrimination laws of New Jersey are in play (because the orthopedics practice is here) and that the anti-discrimination laws of New York and New York City are on the table, too (because the Plaintiff worked remotely out of his Manhattan apartment). See Complaint ¶¶ 4-14, 25-26.

When a number of different laws are invoked, that sometimes[10] implies the need to decide which law governs.

For now, though, the Court concludes that there is no need to choose. See Part II.A. So the Court moves forward to the merits of the motion to dismiss --- and determines that the Plaintiff's anti-discrimination claims cannot now be dismissed. See Part II.B.

### A. Choice of Law

How to decide which anti-discrimination law applies here?

In two steps, as described more fully in Schulman v. Zoetis, Inc., 684 F. Supp. 3d 275 (D.N.J. 2023), and Davis v. BMW of N. Am., LLC, 810 F. Supp. 3d 528 (D.N.J. 2025).[11]

In the first step, the Court looks to the reach of the various bodies of law put forward by the parties. Which law can cover the allegations in the case?[12]

---

[10] Not always. See footnote 14.

[11] These cases take roughly the same approach as the Restatement (Third) of Conflict of Laws. That Restatement is currently in draft. See Restatement (Third) of Conflict of Laws (A.L.I., Tentative Draft No. 6, 2026).

[12] This scope-of-the-law question is resolved in the ordinary ways that the meaning of statutes is assessed. Reading the statute's text, working through caselaw decided under it, etc. See Davis, 810 F. Supp. 3d at 540 n.9; see also, e.g., Schulman, 684 F. Supp. 3d at 277-87.

If more than one law can, the question is which should. That is the second step --- a comparative question, of choice of law.[13]

Here, the parties zero in on the first question --- about the scope of the various laws. See Defendants' Brief at 10-14; Plaintiff's Brief at 12-15; Memorandum of Law in Further Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint ("Defendants' Reply") (ECF 39) at 3-4. But they all but ignore the second question, the comparative one.

How to go forward?

The most efficient way is to bracket the which-law-applies questions for now, to defer answering them until later in this case.[14]

---

[13] The comparative question would be resolved here by the choice-of-law rules of New Jersey, because the Court's jurisdiction is invoked based on the diversity statute. See Complaint ¶ 2; see generally Klaxon v. Stentor Elec. Mfg. Co., 313 U.S. 487 (1941).

[14] At the motion to dismiss stage, courts often opt to put off choice-of-law questions --- in favor of waiting until the litigation unfolds a bit more to resolve them. See, e.g., Jenner v. Volvo Cars of N. Am. LLC, 2023 WL 2554697, at *2-3 (D.N.J. Mar. 17, 2023); Arçelik A.Ş v. E.I. du Pont de Nemours and Co., 2018 WL 1401327, at *9 (D. Del. Mar. 20, 2018); Barry v. Mega Brands Inc., 2009 WL 233508, at *4 (D.N.J. Jan. 30, 2009); Godfry v. State Farm Mut. Ins. Co., 2009 WL 564636, at *2 n.4 (E.D. Pa. Mar. 4, 2009); Arcand v. Brother Intern. Corp., 673 F. Supp. 2d 282, 295 (D.N.J. 2009). Why this will often make sense (at least in non-class-action cases, see Davis, 810 F. Supp. 3d at 536-39) is not hard to see. Under the rules associated with the Restatement (First) of Conflict of Laws, the question of what body of substantive law to apply often turns on a crisp and narrow set of facts. Where the tire blow-out happened, for example, causing the motorcycle to crash. Or where the truck-driver hit the pedestrian. See Restatement (First) of Conflict of Laws §§ 377-79 (A.L.I. 1934). Where-it-happened information will often be before the court even at the motion to dismiss stage --- because it is so elemental that it will typically be pled in the complaint. And if the information that matters for the choice-of-law decision is already before the court at the motion-to-dismiss stage --- then why not just decide it then? (Moreover, where-it-happened information is rarely contested --- so making a choice-of-law call based only

This is straightforward to do, though seeing why takes a small bit of unpacking. Work through that now.

* * *

The New Jersey anti-discrimination law invoked by the Plaintiff is New Jersey's Law Against Discrimination. See Complaint ¶¶ 1, 148.

Its key provisions are "identical" to the analogous provisions of federal law, at Title VII of the Civil Rights Act of 1964. See Massey v. Borough of Bergenfield, 169 F.4th 188, 195 (3d

---

on the plaintiff's allegations in the complaint will often be non-controversial.) But things have shifted. The Restatement (First) approach has given way in many places. And the newer choice-of-law approaches generally zoom out the view, and look to a much broader body of information --- well beyond, say, the location of an injury. Where, for example, was the tire factory located? See Restatement (Second) of Conflict of Laws § 145(2)(b); Johnson v. Am. Leather Specialties Corp., 578 F. Supp. 2d 1154, 1167 (N.D. Iowa, 2008); McLennan v. Am. Eurocopter Corp., Inc., 245 F.3d 403, 425-26 (5th Cir. 2001); MacDonald v. General Motors Corp., 110 F.3d 337, 342 (6th Cir. 1997); Halstead v. United States, 535 F. Supp. 782, 788 (D. Conn. 1982). As to the truck driver who hit the pedestrian, where does he live? See Restatement (Second) of Conflict of Laws § 145(2)(c); Alsaidi v. Wolfgang Puck Catering and Events, LLC, 814 F. Supp. 3d 517, 527-28 (D.N.J. 2025); Perez v. CRST International, Inc., 355 F. Supp. 3d 765, 774 (N.D. Iowa 2018); Sinnott v. Thompson, 32 A.3d 351, 357 (Del. 2011); Griffith v. White, 929 F. Supp. 755, 759 (D. Vt. 1996). Because this sort of information has little to do with liability, it typically does not need to make an appearance in the complaint. So it may not even be before the court at the point when the motion to dismiss gets teed up. Moreover, this kind of information may be obscure --- the sort of thing that a plaintiff may not even know about without first getting some discovery. Cf. Prestan Prods. LLC v. Innosonian Am., LLC, 2024 WL 278985, at *5 n.17 (D.N.J. Jan. 25, 2024). In light of all this, where the older Restatement (First) rules no longer apply, it will often make sense to defer definitive choice-of-law decisions until later in the case --- to decide them as part of a summary judgment motion, or even on a pre-trial motion in limine. After the key facts have been put before the court. And after there has been some discovery.

Cir. 2026). So the Law Against Discrimination has long been interpreted as mainly tracking federal Title VII law.[15]

For their part, (i) New York City anti-discrimination law and (ii) New York anti-discrimination law --- these are at least as protective of potential plaintiffs as Title VII, and are almost surely a bit more protective than Title VII.[16]

In short, the New Jersey law invoked by the Plaintiff is about as favorable to him as the federal Title VII; and the New York and New York City laws invoked by the Plaintiff are generally as favorable to him, or perhaps more favorable to him, than Title VII.

Treating Title VII as a shared measuring stick makes it clear that of the three anti-discrimination laws that the Plaintiff invokes, New Jersey law is the one that is generally least favorable to him.

So it stands to reasons that if he can survive the Defendants' motion to dismiss his New Jersey law claim, then he can survive the Defendants' motion as to his New York and New York City claims.

---

[15] See id. at 193-96; accord, e.g., Sabatino v. Saint Aloysius Parish, 288 N.J. Super. 233, 239 (App. Div. 1996) ("In assessing claims brought under the [anti-discrimination law], . . . our courts have adopted the analysis used by federal courts in resolving claims under Title VII[.]"); Grigoletti v. Ortho Pharma. Corp., 118 N.J. 89, 106-07 (1990) ("We . . . have borrowed heavily from the federal experience to assure some reasonable degree of symmetry and uniformity."); see also Payton v. N.J. Turnpike Auth., 148 N.J. 524, 538 (1997); Parker v. City of Trenton, 2008 WL 2917184, at *8 (N.J. App. Div. July 31, 2008); Thomas v. Cnty. of Camden, 386 N.J. Super. 582, 595-596 (App. Div. 2006).

[16] See Qorrolli v. Metro. Dental Assocs., 124 F.4th 115, 122-23 (2d Cir. 2024); Knight v. MTA – New York City, 2026 WL 875339, at *2 (E.D.N.Y. Mar. 31, 2026); Shibley v. City of New York, 247 N.Y.S.3d 1206(A), at *4-5 (N.Y. Sup. Ct. 2026); Mumin v. City of New York, 760 F. Supp. 3d 28, 44 (S.D.N.Y. 2024); McLeod v. Jewish Guild for the Blind, 864 F.3d 154, 157 (2d Cir. 2017); Mihalik v. Credit Agricole Cheuvreux N. Am., Inc., 715 F.3d 102, 108 (2d Cir. 2013); cf. Rivas v. Int'l Acad. of Hope, 2024 WL 4158003, at *7 (N.Y. Sup. Ct. Aug. 30, 2024).

The question, then, is whether the Defendants' motion to dismiss should be granted as to the Plaintiff's New Jersey claim. Take that on now.

### B. Merits

The Plaintiff's sex discrimination claim is pressed mainly on a "quid pro quo" theory.

That sort of theory is generally based on allegations that "an employer [has] attempt[ed] to make an employee's submission to sexual demands a condition of his or her employment." Lehmann v. Toys R Us, Inc., 132 N.J. 587, 601 (1993).

Here, it is contended that the Defendant "used the [Plaintiff's] . . . rejection of his advances as the basis for a decision affecting the compensation, terms, conditions or privileges of the [Plaintiff's] job." Plaintiff's Brief at 21 (internal quotation omitted); see also Complaint ¶¶ 1, 124, 134, 149.

More particularly, after they broke up, the Plaintiff allegedly turned down the Defendant's efforts to restart the relationship. See id. ¶¶ 49-50, 54-56, 67, 69. And allegedly rejected his requests for sex. See id. ¶¶ 49, 54.

A bit less than three weeks later, the Defendant allegedly determined that the Plaintiff would no longer be able to work remotely. See Complaint ¶¶ 59-60.

Per the Plaintiff, this alleged sequence of events adds up to a winning quid pro quo claim: the Plaintiff spurned the Defendant, and based on that the Defendant took away a workplace perk, the ability to work from home.[17]

---

[17] These sorts of allegations are familiar in the federal-law quid pro quo context. A Title VII plaintiff can often press a claim where, as alleged here, "submission to or rejection of [sexual] conduct by an individual is used as the basis for employment decisions[.]" Bonenberger v. Plymouth Twp., 132 F.3d 20, 27 (3d Cir. 1997) (internal quotation omitted). But note: the New Jersey Supreme Court decision that articulated the state-law quid pro quo standard defined it in terms of an ex ante condition --- a supervisor telling an employee that he would fire her if she did not, in the future, have sex with him. See Lehmann, 132 N.J. at 601. This case concerns something arguably a bit different. An alleged ex post consequence --- the Defendant allegedly visiting a negative workplace

But the Defendant sees it differently.

He argues that the motion to dismiss should be granted because there was a separate reason why the Plaintiff was required to stop working from home, and to come back to the office. Namely, that the Plaintiff[18] had failed to properly complete a particular task while working remotely. See Defendants' Reply at 9. Only after that did the Defendant require him to come back in person. See id.

This adds up to a dispute over causation.

Was remote work dialed back because the Plaintiff allegedly spurned the Defendant? Or was it taken away for a different reason, because the Plaintiff allegedly did not handle a task as he should have?

The Court's conclusion: it is plausible that the remote-work change was caused by the Plaintiff's alleged spurning of the Defendant.[19]

Unpack the basis for this conclusion, see Part II.B.1, and why the Defendants' counterarguments against it do not work. See Part II.B.2. Then take up a knock-on implication of the Court's conclusion as to hostile work environment, see Part II.B.3, and finally a loose end that may be relevant later. See Part II.B.4.

### 1. Quid Pro Quo

"[U]nder New Jersey law[,] causation is generally rooted in considerations of 'common sense.'" Mirena v. Exec. Jet Mgmt., Inc., 760 F. Supp. 3d 224, 232 (D.N.J. 2024) (cleaned up).

---

consequence (no remote work) on the Plaintiff after he turned him down, in the past. The parties do not suggest that this might make a difference. (And at least one New Jersey court has said that it does not. See Drago v. Commc'n Workers of Am., 2007 WL 92606, at *8-9 (N.J. App. Div. Jan. 16, 2007).) Given that the parties do not take up this issue, the Court does not either.

[18] As he alleges in the complaint. See Complaint ¶ 59.

[19] "Plausible" because that is the standard on a motion to dismiss. See Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007).

And as a general matter, one common-sense way to evaluate whether A caused B is to look to (1) quality, (2) quantity, and (3) timing. See id. at 234-35.

As to quality, is the asserted cause A the kind of thing that can cause effect B? As to quantity, was there enough of A to cause B? And as to timing, is there a close-enough temporal link between A and B to suggest that A did, in fact, cause B? See id.[20]

Now work through each of these three.

---

[20] To see this, take an analogy laid out in the just-cited workplace-focused case, as to a farmer whose fields were drowned in a flood.

> Say the farmer sues a nearby dam operator, claiming the operator swung open the dam's floodgates, causing the flood.
>
> The farmer's claim may well hang together --- because there is a common-sense link between the cause invoked by the farmer (the opening of the floodgates) and the effect (the flooding of her farm).
>
> But the farmer's claim plainly will not work if her complaint blames the flood on a loud party at the dam site. Loud parties can have effects --- they can, for example, interfere with a person's right to "quiet enjoyment" of her property. But they do not cause floods.
>
> Bottom line: common sense teaches that an asserted cause must have happened factually --- and it must also have a certain quality to it, it must be the kind of thing that can cause a given effect.
>
> And there is a quantity aspect to causation, too. A torrent of water can cause a field to flood. But not a trickle.
>
> And finally, there is a timing aspect. Opening the dam's floodgates two or three hours before the farm was submerged might have caused the flood. But the hypothesized causal chain is more tenuous if the farmer's argument is that opening the floodgates two or three years ago caused the flood.

Mirena, 760 F. Supp. 3d at 234-35.

**a) Quality**

In claiming that (i) rejection of the Defendant by the Plaintiff caused (ii) the Defendant to take away the Plaintiff's ability to work remotely --- does the Plaintiff allege the kind of cause (i) that can realistically lead to that consequence (ii)?

Yes, the Court concludes.

Here, the Plaintiff alleges that before the remote-work decision came down, the Plaintiff declined his (the Defendant's) efforts to rekindle their relationship --- by, for example, saying no to the Defendant's romantically-tinged offer to have dinner. See Complaint ¶ 56. And the Plaintiff alleges that he said no to the Defendant's requests for sex. See Complaint ¶¶ 48, 50, 54.[21]

Courts regularly confront similar situations --- and routinely allow quid pro quo claims to go forward.

Where the employee who later suffers a negative workplace consequence previously turned down a potentially romantic or dating-related offer from a boss. See, e.g., Twine v. AT&T, Inc., 755 F. Supp. 3d 959, 972-73 (E.D. Va. 2024) (an offer to stay at the same hotel so they could "hang out, have a few drinks, and have a good time"); Briggs v. Waters, 484 F. Supp. 2d 466, 478-481 (E.D. Va. 2007) (an offer to go on a trip); Savino v. C.P. Hall Co., 988 F. Supp. 1171, 1176, 1183-85 (N.D. Ill. 1997) (an offer for dinner while the supervisor's wife was out of town); Fernot v. Crafts Inn, Inc., 895 F. Supp. 668, 678 (D. Vt. 1995) (an offer to do work at the boss's house).[22]

---

[21] Note that after the Plaintiff's remote work was undone, the Defendant allegedly offered the Plaintiff some remote work back --- but only if the Plaintiff would have sex with the Defendant. See Complaint ¶ 67. This is plausibly relevant here. See United States v. Sutton, 970 F.2d 1001, 1007 (1st Cir. 1992) ("[I]t is an accepted proposition, logically and legally, that subsequent events may shed light upon, and be relevant in determining, what transpired at an earlier time.").

[22] These cases come from the Title VII context. But recall that New Jersey anti-discrimination law mainly tracks federal law. See Part II.A; footnote 15. So the cases are relevant in determining whether the Plaintiff alleges a plausible claim under New Jersey law.

Or where the employee turned down an implicit or explicit request for sex. See Carvalho v. Santander Bank, N.A., 573 F. Supp. 3d 632, 636-37, 644-45 (D.R.I. 2021); Gerald v. Univ. of P.R., 707 F.3d 7, 20-24 (1st Cir. 2013); Howington v. Quality Rest. Concepts, LLC, 298 F. App'x 436, 438, 441-43 (6th Cir. 2008); Farrell v. Planters Lifesavers Co., 206 F.3d 271, 281-86 (3d Cir. 2000); Turner v. Olympic Reg'l Dev. Auth., 89 F. Supp. 2d 241, 245 (N.D.N.Y. 2000); Chamberlin v. 101 Realty, Inc., 915 F.2d 777, 783-85 (1st Cir. 1990); Heelan v. Johns-Manville Corp., 451 F. Supp. 1382, 1388-89 (D. Colo. 1978).[23]

None of this is surprising. Spurned requests for a date or for sex --- these are the kinds of things that can spin off agitation, upset, embarrassment. They can plainly lead the person who was spurned to lash out at the person who did the spurning, including by imposing a negative workplace consequence on him.

It is, in short, plausible that the Plaintiff's rejections of the Defendant are the kind of thing that might have caused the Defendant to withdraw the Plaintiff's ability to work from home.

**b) Quantity**

This point --- as to quantity, how much --- does not need to be belabored here.

Courts have routinely concluded that a one-off request for a dating-style meeting or for sex can be enough to make out a quid pro quo claim. See Savino, 988 F. Supp. at 1183-85; Farrell, 206 F.3d at 276, 283-86.

And here, many more incidents than that are alleged. See Complaint ¶¶ 49, 50, 54-56.

So it is plausible that there was more than enough frequency to the Plaintiff's rejections of the Defendant --- the Plaintiff's rejections came in enough "quantity" that they could have caused

---

[23] See also Coe v. N. Pipe Prods., Inc., 589 F. Supp. 2d 1055, 1083-84 (N.D. Iowa 2008); Ruiz v. Caribbean Rests., Inc., 54 F. Supp. 2d 97, 100, 105-07 (D.P.R. 1999); Rettiger v. IBP, Inc., 980 F. Supp. 1182, 1186, 1189-90 (D. Kan. 1997); cf. Moberly v. Midcontinent Commc'n, 711 F. Supp. 2d 1028, 1038-39 (D.S.D. 2010) (supervisor said he was attracted to employee and that he wanted to spend the entire day in her office).

the Defendant to decide to no longer allow the Plaintiff to do remote work.

**c) Timing**

Look now to a third and final factor --- the amount of time that ran off the clock between the asserted cause (the Plaintiff allegedly rejecting the Defendant's advances) and the asserted effect (the Defendant allegedly quashing the Plaintiff's ability to do remote work).

"Closeness-in-time between asserted cause and asserted effect supports an inference of causation, and remoteness-in-time detracts from it." Mirena, 760 F. Supp. 3d at 240.

Here, 19 days passed between the Plaintiff allegedly breaking up with the Defendant and the Defendant revoking his remote work. See Complaint ¶¶ 59-60.

This means that fewer than 19 days must have run from (i) the Plaintiff's after-the-break-up rejections of the Defendant[24] to (ii) the Defendant putting an end to the Plaintiff's remote work.

And that gap is short enough to support a plausible inference of causation.

Indeed, in Farrell v. Planters Lifesavers Co., the Third Circuit confronted similar timing, where the defendant terminated the plaintiff from her job less than a month after she turned down her supervisor's advances. See 206 F. 3d at 276. She sued on, among other things, a quid pro quo theory. See id. at 278.[25]

The Third Circuit held that summary judgment was improper, allowing the plaintiff's quid pro quo claim to go forward in part because of "the timing of [the plaintiff's] termination." Id. at 286. That less-than-one-month period was "relatively close timing," "suggestive" as to the plaintiff's quid pro quo claim. Id.

---

[24] For these, see Complaint ¶¶ 49-50, 54-56.

[25] Farrell is a Title VII case. But as discussed above, New Jersey's Law Against Discrimination tracks Title VII. See Part II.A; footnote 15. So Title VII cases are highly relevant in analyzing Law Against Discrimination claims.

A shorter period, like the one that the Plaintiff alleges here, is that much more suggestive than the one in Farrell.[26]

And Farrell is no outlier.

Courts have consistently allowed quid pro quo claims to go forward based on a time lag longer than the one here between a plaintiff rebuffing an advance and the relevant negative workplace consequence being imposed on the plaintiff. See, e.g., Twine, 755 F. Supp. 3d 959, 974-75 (E.D. Va. 2024) (2.5 months); Doe v. Shippensburg Univ. of Pa., 2022 WL 676970, at *3 (M.D. Pa. Mar. 7, 2022) ("a few days or weeks"); Lewis v. Forest Pharms., Inc., 217 F. Supp. 2d 638, 649 (D. Md. 2002) (one month); cf. Foster v. Univ. of Md.-Eastern Shore, 787 F.3d 243, 253 (4th Cir. 2015) (one month for retaliation claim); DiCarlo v. Potter, 358 F.3d 408, 421-22 (6th Cir. 2004) (21 days for retaliation claim).

### 2. Conclusion --- and Counterarguments

Where things stand.

The Defendant has moved to dismiss the Plaintiff's quid pro quo claim on lack-of-causation grounds.

But all three of the causation factors --- quality, quantity, and timing --- suggest that the Plaintiff's causation account hangs together. See Part II.B.1.a to Part II.B.1.c.

Pair that up with the Court's obligation at this stage to draw all reasonable inferences for the Plaintiff,[27] and this is clear: the Plaintiff has plausibly alleged that his rebuffing of the Defendant caused the Defendant to eliminate his (the Plaintiff's) remote work.

Plausibility is what is needed for now, see footnote 19, so the Defendant's motion to dismiss the Plaintiff's New Jersey quid pro quo claim must be denied.

---

[26] And all the more so because this case is at the motion-to-dismiss stage, where the lower bar of plausibility is the one the Plaintiff needs to clear.

[27] See Iqbal, 556 U.S. at 678.

And that means[28] that the motion must also be denied as to the quid pro quo claim under New York law and New York City law.[29]

* * *

Before solidifying the conclusion set out just above, pause here to take stock of the Defendant's two main counterarguments.

First, that the real reason the Plaintiff's remote work was rescinded was that he had done a poor job on a particular workplace task. See Defendants' Reply at 9.

In this end, this may or may not prove to be right. But for now, it is irrelevant.

The Plaintiff has established the plausibility of his account of what caused his remote-work privileges to be abolished. And on a motion to dismiss, plausible allegations from the Plaintiff are all that is necessary --- there is no need to also cross off the list the Defendant's explanation as to what happened.[30]

---

[28] See generally Part II.A.

[29] New Jersey and New York State allow quid pro quo claims. See Lehmann, 132 N.J. at 601; Bouveng v. NYG Cap. LLC, 175 F. Supp. 3d 280, 311, 314 (S.D.N.Y. 2016). Under New York City law, quid pro quo is not generally understood as its own category of claims. See Friederick v. Passfeed, Inc., 2022 WL 992798, at *7 (S.D.N.Y. Mar. 31, 2022). New York City law focuses on whether there is "unequal treatment based on gender." Id. (cleaned up). But the parties do not take this up. So the Court will deny the motion to dismiss the New York City law quid pro quo claim to the extent such a claim exists and assuming for here --- as the parties do, see Plaintiff's Brief at 21-23 and Defendants' Reply at 7-9 --- that it is roughly comparable to New York quid pro quo claims.

[30] See Doe v. Princeton Univ., 30 F.4th 335, 344 (3d Cir. 2022) (holding that "alternative explanations are not fatal to [a plaintiff's] ability to survive a Rule 12(b)(6) motion to dismiss" even if the alternative is "the most plausible" explanation (internal quotation omitted)); see also Anderson News, L.L.C. v. Am. Media, Inc., 680 F.3d 162, 184 (2d Cir. 2012) ("[t]he choice between two plausible inferences that may be drawn from factual allegations is not a choice to be made by the court on a Rule 12(b)(6) motion"); In re Ins. Brokerage Antitrust Litig., 618 F.3d 300, 341 n.42 (3d Cir. 2010) (holding that at the motion-to-dismiss stage, a plaintiff does not need to "plead facts supporting an inference of [the] defendant's

The Defendants' second counterargument: the Plaintiff's allegations simply reflect "interpersonal workplace strife" following a "consensual sexual relationship" --- and that "harassment by a co-worker is not based on sex where it arises from a failed personal relationship." Defendants' Brief at 15-16. (internal quotations omitted).

The argument seems to be that requests for dates or for sex that are rebuffed, and then lead to negative workplace consequences --- these are not actionable on a quid pro quo theory when the requests are made between co-workers who used to be in a relationship.

But that is not our law. Actionable conduct is actionable --- with no categorical immunity carved out for those claims that are pressed in the post-breakup context. See Forrest v. Brinker Int'l Payroll Co., LP, 511 F.3d 225, 229-30 (1st Cir. 2007) ("Nowhere does prior case law suggest that certain types of discriminatory behavior, held to constitute gender-based harassment in other cases, may not constitute gender-based harassment when the parties had previously engaged in a romantic relationship."); see also Hornig v. Trustees of Columbia University in City of New York, 2022 WL 976267, at *14 (S.D.N.Y. Mar. 31, 2022); Pergine v. Penmark Mgmt. Co., Inc., 314 F. Supp. 2d 486, 491-92 (E.D. Pa. 2004); Perks v. Town of Huntington, 251 F. Supp. 2d 1143, 1156-57 (E.D.N.Y. 2003); Babcock v. Frank, 729 F. Supp. 279, 288 (S.D.N.Y. 1990).[31]

---

liability more compelling than the opposing inference"); Twombly, 550 U.S. at 556 (the plausibility requirement "does not impose a probability requirement at the pleading stage"); accord, e.g., In re Revlimid & Thalomid Purchaser Antitrust Litig., --- F. Supp. 3d ---, 2026 WL 2923685, at *48 (D.N.J. Sept. 29, 2026); In re Generic Pharma. Pricing Antitrust Litig., 394 F. Supp. 3d 509, 526-27 (E.D. Pa. 2019); Evergreen Partnering Group, Inc. v. Pactiv Corp., 720 F.3d 33, 45 (1st Cir. 2013); Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 458 (6th Cir. 2011); Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 267 (5th Cir. 2009).

[31] Two district court cases have held that "comments indicating a desire to resume the relationship" are not enough to make harassment be based on sex. Conklin v. Cnty. of Suffolk, 859 F. Supp. 2d 415, 428 (E.D.N.Y. 2012); see also Doherty v. Nederlander Producing Co., 2006 WL 2239421, at *5-6 (S.D.N.Y. Aug. 4, 2006). But even assuming they set the legal standard

Bottom line: the Defendants' counterarguments are not persuasive, and the Plaintiff's allegations as to causation are plausible.

Therefore, as to the Defendants' motion to dismiss the Plaintiff's discrimination claims, that motion is denied to the extent those claims rest on a quid pro quo theory.

### 3. Hostile Workplace

In addition to the above, the Defendants argue that the Plaintiff's discrimination claims should be dismissed to the extent they press a hostile work environment theory.[32]

If the workplace allegedly became hostile, the argument goes, that was solely because of the prior relationship. See Defendants' Reply at 12-13.

But that argument fails for the same reasons it does on the quid pro quo theory.

And go further: the Defendant's argument may be less persuasive when it is transposed into the hostile work environment context.

Because in that context, there are more relevant allegations to reckon with --- of alleged conduct by the Defendant that must be considered in addition to the remote-work-related conduct that is at the core of the quid pro quo claim.

As when the Defendant threatened to issue a tax form through his company if the Plaintiff did not have sex with him. See Complaint ¶¶ 47-50, 54.

And as when the Defendant seemingly got other supervisors involved, with one asking the Plaintiff to restart the relationship with the Defendant. See Complaint ¶¶ 51, 55-56; see also E.E.O.C. v. Prospect Airport Servs., Inc., 621 F.3d 991, 1000 (9th Cir. 2010) (determining that a supervisor "recruit[ing] other co-workers" to convey the supervisor's

---

here, Conklin and Doherty are distinguishable. Here, there is more than a "comment[] indicating a desire to resume the relationship." There was, for example, an alleged offer to trade sex for a resumption of the rescinded remote work. See Complaint ¶ 67.

[32] For these, see the complaint at paragraphs 124, 134, 149.

interest in an employee was relevant evidence of a Title VII violation).

### 4. A Loose End

As to the Plaintiff's sex discrimination claims, the Court has held that the Defendants' motion to dismiss must be denied, whether they are based on a quid pro quo theory, see Parts II.B.1 to II.B.2, or a hostile work environment theory. See Part II.B.3.

In addition to the arguments set out above, the Defendants press another point --- that putting an end to an employee's ability to work remotely cannot count as the sort of negative workplace consequence that, when visited on a plaintiff, can form the basis for a quid pro quo claim. See Defendants' Reply at 8-9.

But this argument surfaces only in the Defendants' reply brief. There is nothing about it in their opening papers.

So the Defendants have waived this argument for now. The Court does not need to resolve it. See Specht v. Suarez, 798 F. Supp. 3d 485, 501 n.18 (D.N.J. 2025) (collecting cases).

But the issue may well come up in the next stages of the litigation. So take a moment to tee up some of its contours here.

* * *

As to the can-revoking-remote-work-count question, the Supreme Court has not weighed in. And not the Third Circuit, either.

The district courts are split.

Some hold that cutting off an employee's remote work can open the way to a Title VII claim. See Saunders v. Mills, 172 F. Supp. 3d 74, 100-101 (D.D.C. 2016); Black v. Guzman, 2023 WL 3055427, at *8 (D.D.C. Apr. 24, 2023); cf. Satina v. City of New York, 2025 WL 902893, at *2, *5 (S.D.N.Y. Mar. 25, 2025).

Others land on the opposite conclusion. See Staggers v. Becerra, 2021 WL 5989212, at *17 (D. Md. Dec. 17, 2021); Rim v. Lab'y, 2019 WL 5898633, at *9 (M.D. Tenn. Nov. 12, 2019); Mangus v. Metavante Corp., 2006 WL 689128, at *20 (E.D. Wis. Mar. 17, 2006); cf. Dailey v. Lew, 2016 WL 1558150, at *6 (D. Md. Apr. 18, 2016), aff'd, 670 F. App'x 142 (4th Cir. 2016).

In short, the needle swings back and forth. It does not point in a single direction.[33]

* * *

Especially in light of the lack of consensus in this area, the way forward may be to lean on analogies.

Two seem to present themselves.

* * *

First, taking away an employee's remote work may be like slashing her salary.

After all, many employees would take a large pay cut to be allowed to work remotely.[34]

So by taking away remote work privileges, the employer is in a sense taking away money from its employee --- the difference between (i) the current salary the employee is paid (now without remote work) and (ii) the higher salary she would have required to take the job (had she known that there would be no remote work).

[33] The cited cases measure remote work against differently-phrased standards, which might explain some of the spread in results. Compare Staggers, 2021 WL 5989212, at *15 (requiring a "significant change in employment status" (cleaned up)), with Black, 2023 WL 3055427, at *7-8 (requiring discrimination "with respect to [an] employee's terms, conditions, or privileges of employment," not needing it to be an "objectively tangible harm" (internal quotation omitted)).

[34] See Zoe B. Cullen et al., Home Sweet Home: How Much Do Employees Value Remote Work 4-7 (Nat'l Bureau of Econ. Rsch., Working Paper No. 33,383, 2025) (finding that the average employee is willing to forgo roughly 25% of her salary to be fully remote); Alexander Bartik et al., The Rise of Remote Work: Evidence on Productivity and Preferences from Firm and Worker Surveys 17-20 (Harv. Bus. Sch., Working Paper No. 20-138, 2025) (finding that 40% of workers would take a pay cut greater than 5% to remain remote); Jose Maria Barrero et al., Why Working From Home Will Stick 2 (Nat'l Bureau of Econ. Rsch., Working Paper No. 28731, 2021) (finding that employees would accept an average pay cut of 7% to work from home part-time).

Does the pay-cut analogy hold up? Maybe yes, maybe no.[35]

But if it does, that may weigh in favor of allowing elimination of remote work to count as a potentially actionable workplace consequence imposed on a plaintiff --- because that is how pay cuts are typically treated.[36]

* * *

A second possible analogy.

---

[35] Virtually any workplace perk can with enough study be "priced" --- and taking it away might then seem like a pay cut equal to that price. But remote work may potentially be different. First, because its value to some employees is so large that nixing it might well be a deal-breaker. See Jose Maria Barrero et al., Let Me Work From Home, or I Will Find Another Job 2 (Becker Friedman Inst. Econ., Working Paper No. 2021-87) (finding that roughly 40% of employees who work from home part-time would look for a new job if forced to return to in-person work fulltime). Getting rid of free coffee or a gym membership will feel like a real cost to many employees. But nothing comparable to scrapping remote work. Second, without remote work, most employees need to spend more on commuting costs. See generally Elizabeth Roberto, Commuting to Opportunity: The Working Poor and Commuting in the United States, Brookings Institution 9 (2008) (finding that the average U.S. worker spends 4.1% of her income commuting to work); cf. Alois Stutzer & Bruno S. Frey, Stress That Doesn't Pay: The Commuting Paradox, 110 Scandinavian J. of Econ. 339, 341 (2008). This means that requiring a person to come to work in person directly and all but necessarily decreases the employee's effective take-home pay. If the employer backpedals from the gym membership, workers can choose to pay for their own membership or not. But there is no need for them to. The choice is theirs. Remote work is different. If remote work is eliminated, virtually all workers will have to pay out of pocket, to commute. Because if they do not travel to the office, they will not be able to keep their job. This is what no-remote-work means.

[36] See Kelleher v. Wal-Mart Stores, Inc., 817 F.3d 624, 633 (8th Cir. 2016); Little v. Windermere Relocation, Inc., 301 F.3d 958, 970 (9th Cir. 2002); see also Twine, 755 F. Supp. 3d at 975; Soloski v. Adams, 600 F. Supp. 2d 1276, 1362 (N.D. Ga. 2009); Hill v. Rayboy-Brauestein, 467 F. Supp. 2d 336, 355 (S.D.N.Y. 2006).

Namely, dialing back on an employee's remote work may potentially be analogized to transferring him to a different location.

Being expected to work from the Newark office as opposed to the Trenton office (a transfer) --- that may be a bit like being required to work from the Newark office as opposed to one's Newark apartment (no-remote-work).

But even if the transfer/remote work analogy is tight enough, clarity might not follow --- because courts may be divided as to whether a location transfer can count. Compare, e.g., Montandon v. Farmland Industries, Inc., 116 F.3d 355, 359 (8th Cir. 1997) ("However unpalatable the prospect may have been to him, the requirement that [the plaintiff] move to [another city] did not rise to the level of an adverse employment action."), with Keeton v. Flying J, Inc., 429 F.3d 259, 264-65 (6th Cir. 2005) (a transfer that "increased [a] commute to the extent that [the plaintiff] needed to consider relocation" could be an actionable tangible employment action).

* * *

In a nutshell, the issues raised by remote work in this context may be complex --- with the cases scattered here and there, and the possible analogies[37] not necessarily cleating things up.

The Court mentions this not to suggest a view. But only because these issues may need to be reckoned with soon, at the next stage of the case.[38]

---

[37] There could very well be others.

[38] And there may be other issues, too. New Jersey law and New York law use slightly different verbal formulations to capture the sorts of negative workplace consequences that must be there to make out a quid pro quo claim. Compare Lehmann, 132 N.J. at 601 (New Jersey law: "adverse employment consequences") with Bouveng, 175 F. Supp. 3d at 311 (New York law: "tangible employment action"). Are these just synonyms for the same thing? Or are the standards substantively different? (As to federal law on these questions, compare Muldrow v. City of St. Louis, 601 U.S. 346, 355 (2024) and Peifer v. Board of Probation and Parole, 106 F.4th 270, 277 (3d Cir. 2024) with Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998) and Minarsky v. Susquehanna Cnty., 895 F.3d 303, 310 (3d Cir. 2018)).

## II. Disability Claims

Separate from his sex-discrimination claims, the Plaintiff also presses two disability-related claims, each grounded in his alleged anxiety.

First, he claims that the Defendants did not accommodate his anxiety, as required under New York City law and New Jersey law. See Complaint ¶¶ 138-43, 147-49.[39]

And second, the Plaintiff contends that he was discriminated against because of his anxiety, violating New York, New York City, and New Jersey law. See Complaint ¶¶ 122-25, 132-34, 147-49.[40]

Take those up in turn.

### A. Failure to Accommodate

Per the Plaintiff, the Defendants failed to accommodate him by denying his request to take time off for his anxiety. See Plaintiff's Brief at 27-28.

The Defendants see things differently.

They contend that they rejected the Plaintiff's requests because they were not sufficiently supported. One came with no medical documents. See Defendants' Reply at 9-10. And the other had back-up --- but its back-up, a therapist's letter, said that

---

[39] The Plaintiff also references New York law in his brief. See Plaintiff's Brief at 27. But New York's failure to accommodate claims come under N.Y. Exec. Law § 296(3)(a). And the Plaintiff did not cite that in his complaint, so has not brought a failure to accommodate claim under New York law. Note that no specific New Jersey law provision is cited in the complaint either. But no matter. New Jersey does not have a free-standing failure to accommodate provision; rather, those sorts of claims simply arise under New Jersey's more general statutory prohibition on disability discrimination. See Caraballo v. City of Jersey City Police Dep't, 237 N.J. 255, 267-68 (2019). And the Plaintiff pressed a New Jersey disability discrimination claim in his complaint. See Complaint ¶¶ 147-49.

[40] There is a third claim, too, under New York City law. It is addressed in footnote 43.

time off for anxiety was "strongly recommended[ed]," not necessary. See id.[41]

The argument seems to be that an invocation of necessity triggers an accommodation obligation. Not a "strong recommend[ation]."

But nothing is cited for that distinction. No statutory language and no caselaw. No argument for why a provider's note needs to speak in terms of necessity.

This is fatal. "[I]t is a defendant's burden on a motion to dismiss to show that [something] is a winning argument." Volynsky v. Prudential Ins. Co. of Am., 2025 WL 3062787, at *1 (D.N.J. Nov. 3, 2025) (emphasis omitted) (citing Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005)).

Moreover, note that under New Jersey law and New York City law, the federal Americans with Disabilities Act is treated as highly instructive.[42] And under the ADA, "[m]edical documentation is not [even] required" for a plaintiff to submit a valid

---

[41] Per the complaint, the letter read as follows.

> I am writing again on behalf of my client . . . to support his ongoing management of anxiety. Over the past few weeks, [Plaintiff's] stress levels have continued to escalate, compounding his anxiety and make it increasingly difficult for him to function at his usual capacity.
>
> Given the undue stress he has been experiencing, I strongly recommend that he be granted an additional week of paid time off from February 21, 2025, through February 28, 2025. This extended leave will provide him with the necessary time to engage in intensive therapeutic work and self-care, ultimately aiding in his recovery and ability to return to work in a more stable state.

Complaint ¶ 77 (emphasis added) (alterations in original).

[42] New Jersey law generally follows the ADA. See Armstrong v. Burdette Tomlin Memorial Hosp., 438 F.3d 240, 246 n.12 (3d Cir. 2006) ("The requirements for failure to accommodate claims under New Jersey's LAD have been interpreted in accordance with the Americans with Disabilities Act."). And New York City's law is even broader. See American Council of the Blind of New York, Inc. v. City of New York, 579 F. Supp. 3d 539, 571-72 (S.D.N.Y. 2021).

accommodation request. King v. Steward Trumbull Memorial Hosp., Inc., 30 F.4th 551, 564 (6th Cir. 2022). And a district court has rejected the precise argument the Defendants press here. See also Malas v. Hinsdale Twp. Dist. #86, 2019 WL 2743590, at *19 (N.D. Ill. July 1, 2019).[43]

* * *

The Defendants offer another argument related to failure-to-accommodate: that the Plaintiff "does not allege that other non-disabled employees were permitted to take paid time off in the manner described by [the] Plaintiff." Defendants' Reply at 10.

The premise seems to be that a comparator is a necessary component of an accommodation claim --- that something can only be required as an accommodation if it is also offered to other employees.[44]

But same problem as before. The Defendant cites no New Jersey law or New York City law to back up his argument.

And he does not reckon with that the fact that failure-to-accommodate claims under the federal ADA[45] are not like "race and sex employment discrimination cases, [where] discrimination is usually proved by showing that employers treat similarly situated employees differently." Holly v. Clairson Indus., L.L.C., 492 F.3d 1247, 1262 (11th Cir. 2007).

---

[43] In addition to his failure-to-accommodate claims, the Plaintiff also claims that the Defendants failed to participate in a "cooperative dialogue" to work through his accommodations. See Complaint ¶¶ 140-43. That is an independently actionable claim under New York City law. See, e.g., Baker v. Bridge Inc., 805 F. Supp. 3d 521, 549 (S.D.N.Y. 2025). The Defendants argue back that they did "engage[] in the interactive process" because they "approved each of [the] Plaintiff's accommodation requests supported by medical documentation." Defendants' Brief at 24. But as noted, the Defendants' documentation argument is not persuasive.

[44] This is how, for example, equal protection claims work. See Stradford v. Sec., Pa. Dep't of Corr., 53 F.4th 67, 73-77 (3d Cir. 2022); Hill v. Borough of Kutztown, 455 F. 3d 225, 239 (3d Cir. 2006).

[45] See footnote 42.

Indeed, "the very purpose of reasonable accommodation laws is to require employers to treat disabled individuals differently in some circumstances." Id.[46] So a comparator is not generally taken as necessary for an ADA failure-to-accommodate claim. See id. at 1261-63.

Here, the Defendants seem to suggest that they have a specific time-off policy. And it was applied in a disability-neutral way --- the Plaintiff was denied his requested time off, just as his non-disabled colleagues would have been. Therefore, the argument goes, the Plaintiff's requested accommodation did not need giving.

But the fact that a requested accommodation, like time off, would violate an employer's "disability-neutral rule," like a time-off policy, "cannot by itself place the accommodation beyond [disability law's] potential reach." US Airways, Inc. v. Barnett, 535 U.S. 391, 397 (2002); see also Holly, 492 F.3d at 1262-63; Shapiro v. Twp. of Lakewood, 292 F.3d 356, 360-61 (3d Cir. 2002).[47]

* * *

---

[46] The Eleventh Circuit's logic in Holly seems to run as follows. Purely equality-focused parts of our law require A (someone with a particular attribute) to be treated the same as B and C (other people with different attributes) --- and so a claim by A requires a comparison to how B or C are being treated. But the relevant parts of the ADA do not set out an equality-focused standard. They establish a substantive standard. The disabled individual, A, needs to be treated in a certain way --- allowed to use a particular keyboard, say, or to work from home. And that obligation is mostly independent of how other kinds of people (B and C, who are not disabled) are treated. See Pamela S. Karlan & George Rutherglen, Disabilities, Discrimination, and Reasonable Accommodation, 46 Duke L.J. 1, 2-3, 10-11 (1996); cf. Michael Ashley Stein, Same Struggle, Different Difference: ADA Accommodations as Antidiscrimination, 153 U. Pa. L. Rev. 579, 582-83(2004); Christine Jolls, Antidiscrimination and Accommodation, 115 Harv. L. Rev. 642, 649-51 (2001).

[47] It may potentially shed light on whether the accommodation is reasonable. But that is not the argument that the Defendants make.

In sum, the Defendants' argument for dismissing the Plaintiff's failure-to-accommodate claims are not persuasive.

### B. Discrimination

Next, the Plaintiff claims that he was discriminated against because of his anxiety, including by being suspended from work on account of the disability. See Plaintiff's Brief at 23-27; Complaint ¶¶ 74, 124, 134, 149.

The Defendants contend that this claim does not work because there is no causal link between (i) the Plaintiff's disability and (ii) any adverse employment action. See Defendants' Brief at 22-23; 11-12.

But only a week allegedly ran from when the Defendants first learned of the Plaintiff's disability[48] and his suspension. See Complaint ¶¶ 59, 64, 73-74.

And "temporal proximity between the employer's knowledge of the employee's disability and the adverse employment action" can suggest causation and give rise to a plausible disability discrimination claim. See Goodwin v. Univ. of Pa., 2023 WL 8027306, at *16 (E.D. Pa. Nov. 20, 2023), aff'd, 2024 WL 4678877 (3d Cir. Nov. 5, 2024).

Indeed, a one-week gap is close in length to others that have been considered "unduly suggestive" --- enough to clear the relatively low bar of plausibility. See Hollingsworth v. R. Home Prop. Mgmt., LLC, 498 F. Supp. 3d 590, 603 (E.D. Pa. 2020) (quoting Thomas v. Town of Hammonton, 351 F. 3d 108, 114 (3d Cir. 2003)); cf. Lichtenstein v. Univ. of Pittsburgh Med. Ctr., 691 F.3d 294, 307 (3d Cir. 2012); Douglas v. Kensington Comm. Corp. for Individual Dignity, 775 F. Supp. 3d 881, 900 (E.D. Pa. 2025); Samuels v. Urb. Assembly Charter Sch. for Comput. Sci., 2024 WL 4008165, at *6 (S.D.N.Y. Aug. 30, 2024).

And courts routinely look to longer gaps and allow disability discrimination claims to move forward, at least at this early

[48] The complaint does not directly allege a point at which the Defendants first learned of the Plaintiff's anxiety. So the Court proceeds, for now, under the plausible assumption that the Defendants did not know about his anxiety until the Plaintiff first asked for time off, mentioning the condition. See Complaint ¶ 64.

stage. See Cowgill v. First Data Techs., Inc., 41 F.4th 370, 380-81 (4th Cir. 2022); Pustilnik v. Battery Park City Auth., 147 N.Y.S.3d 357, 370 (N.Y. Sup. Ct. 2021); Godbee v. Sam's West, Inc., 2022 WL 2804843, at *1, *5 (S.D. Fla. Feb. 17, 2022); Emmell v. Phoenixville Hosp. Co., LLC, 303 F. Supp. 3d 314, 332 (E.D. Pa. 2018); Vale v. Great Neck Water Pollution Control Dist., 80 F. Supp. 3d 426, 437 (E.D.N.Y. 2015) (collecting cases).[49]

There may be alternative explanations for why the Plaintiff was suspended.

But for now, see Part II.B.2, the Plaintiff's plausible allegations are enough. He does not need to knock the Defendants' alternative explanations out of the box.[50]

* * *

In sum, the Defendants' arguments are not persuasive --- to dismiss the Plaintiff's failure-to-accommodate-anxiety claim, see Part III.A, or to dismiss the claim that he was discriminated against because of that anxiety. See Part III.B.

---

[49] The Defendants also argue that the Plaintiff has not presented any comparators --- other employees, whom the Defendants treated better. See Defendants' Brief at 21-23; Defendants' Reply at 11. To the extent that argument is only about the Plaintiff's failure-to-accommodate claims, it was addressed in Part II.A. And to the extent it is also about these disability discrimination claims, fares no better. The cases that the Defendants highlight note the importance of comparators in the absence of other evidence of causation. See Marquez v. Starrett City Assocs., 406 F. Supp. 3d 197, 207 (E.D.N.Y. 2017); Green v. Bessent, 2025 WL 936542, at *9 (D.N.J. Mar. 27, 2025). But here, there is other plausible evidence --- the unduly suggestive timing described in the text. (Indeed, one of the Defendants' cases suggests that close timing might change the result. See Marquez, 406 F. Supp. 3d at 207 (contrasting another case where a workplace consequence came "just days" later (quoting Vale, 80 F. Supp. 3d at 437))).

[50] See footnote 30; The parties do not address whether suspensions are the sort of workplace consequence that can give rise to disability discrimination claims. So the Court assumes, without deciding, that they are.

## III. Common Law Claims

Separate from his statutory claims, the Plaintiff presses three claims under New York's common law --- for conversion, unjust enrichment, and quantum meruit. See Complaint ¶¶ 154-65.[51]

All these flow from the allegation that the Defendants deducted a little over $2,100 from the Plaintiff's final paycheck --- which was used to cover the cost of a class that the Plaintiff had started (but not finished) for his job. See Complaint ¶¶ 86, 91; Plaintiff's Brief at 33-34.

The Defendants advance two arguments as to all this, focused solely on the conversion claim. Neither is persuasive.

* * *

First, the Defendants assert that the $2,100 was not held in a specific, identifiable fund --- generally a requirement under New York law for money-focused conversion claims. See Defendants' Brief at 24-26; Advanced Oxygen Therapy Inc. v. Orthoserve Inc., 572 F. Supp. 3d 26, 37-38 (S.D.N.Y. 2021).

But the Plaintiff meets that requirement here. Identifying money withheld from specific paychecks is enough. See Doo Nam Yang v. ACBL Corp., 427 F. Supp. 2d 327, 341 (S.D.N.Y. 2005). And that is what the Plaintiff does here --- he points to a particular paycheck that is allegedly missing $2,112.68. See Complaint ¶ 86.

* * *

Second, the Defendants argue that the Plaintiff did not allege a demand for the money --- also a requirement for New York conversion claims. See Defendants' Brief at 26; V&A Collection, LLC v. Guzzini Props. Ltd., 46 F.4th 127, 133 (2d Cir. 2022) (requiring that "the rightful owner make[] a demand for the property").

But the Plaintiff alleged that he "complained about the unlawful deduction." Complaint ¶ 90. For now that is plausibly enough --- "[a] demand need not use the specific word 'demand' so long

---

[51] The Defendants do not expressly dispute that New York common law applies.

as it clearly conveys the exclusive claim of ownership." Feld v. Feld, 279 A.D.2d 393, 394 (N.Y. App. Div. Jan. 25, 2001).[52]

## IV. Conclusion

The Defendants' motion at ECF 30 is denied.[53]

---

[52] Note that the Defendants raise some other arguments for dismissal of the three common law claims --- each grounded in an assertion that the Plaintiff had an employment contract. See Defendants' Brief at 27-29; Defendants' Reply at 14. If there was in fact a contract, that may well be relevant here. See Clark-Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 389 (1987) (holding that a breach of contract cannot generally be considered a tort); id. at 656 (holding that a contract's existence precludes recovering the same subject matter in quasi contract/unjust enrichment); id. at 681 (same for quantum meruit). But the complaint does not allege that the Plaintiff had an employment contract. And except in circumstances not relevant here, a motion to dismiss is concerned only with what is in the complaint. Things might be different in cases whose claims necessarily assume the existence of a contract --- and this might be one of those cases. But the Defendants do not make any arguments along those lines.

[53] In their papers, the Defendants also argue that the complaint should be dismissed because it amounts to group pleading. See Defendants' Brief at 3-8. But group pleading is regularly allowed as to closely-related business entities, like the three corporate Defendants here. See Longmeadow One Solar LLC v. Trina Solar Co., Ltd., 2025 WL 2476522, at *4 (D.N.J. Aug. 28, 2025); United States v. Nat'l Gen. Holdings Corp., 2025 WL 1104018, at *12 (W.D. Pa. Apr. 14, 2025); Ponzio v. Mercedes-Benz USA, LLC, 447 F. Supp. 3d 194, 226 (D.N.J. 2020) (collecting cases). And all the more so here, where the Plaintiff alleges that he was jointly employed by all three of the entities (and also jointly supervised by the two natural-person-Defendants). See Complaint ¶¶ 14, 16, 18, 19, 22, 24-25, 27. The Defendants also argue that the complaint must be dismissed because it incorporates every factual allegation into every count of the complaint. But the complaint is "not so vague or ambiguous that it fails to give [the Defendants] notice of the claims against [them]." Fike v. Global Pharm. Healthcare Priv., Ltd., 741 F. Supp. 3d 265, 274 (E.D. Pa. 2024); see also

IT IS on this 16th day of October, 2026, **SO ORDERED.**

Michael E. Farbiarz, U.S.D.J.

---

M.B. v. Schuylkill Cnty., 375 F. Supp. 3d 574, 587 (E.D. Pa. 2019).